STATE OF NORTH CAROLINA v. RAYMOND THOMAS THIBODEAUX

No. 157A99

(Filed 25 August 2000)

1. **Evidence— murdered wife's testimony of prior assault by husband—hearsay—admissible**

The trial court did not err in a capital first-degree murder prosecution by admitting the victim's testimony from a domestic violence protective order hearing regarding an assault upon her by defendant. Defendant was precluded from raising on appeal an objection based upon N.C.G.S. § 8C-1, Rule 804(b)(1) because it was not raised at trial; the hearsay statements in the testimony were admissible as statements of the declarant's then existing mental, emotional, or physical condition; when a husband is charged with murdering his wife, evidence spanning the entire marriage is allowed to show malice, intent, and ill will; and the court's ruling that the probative value was not outweighed by the prejudice was not manifestly unsupported by reason. N.C.G.S. § 8C-1, Rules 804(b)(5), 803(3), 404(b), and 403.

STATE v. THIBODEAUX

[352 N.C. 570 (2000)]

**2. Appeal and Error— preservation of issues—objection when witness called—no objection when evidence introduced**

A defendant in a capital first-degree murder prosecution did not preserve for appellate review evidentiary issues where he objected when the witnesses were called; the trial judge removed the jury, considered the forecast of evidence and the legal arguments, and found the evidence admissible; and defendant did not object when the testimony was subsequently introduced before the jury. The arguments preceding the calling of the witnesses were tantamount to motions in limine and defendant must make an objection at the time the evidence is actually introduced to preserve the question of admissibility for appeal.

**3. Homicide— second-degree murder—voluntary intoxication—no evidence of intoxication when killing occurred**

The trial court in a capital first-degree murder prosecution did not err by not submitting second-degree murder based upon voluntary intoxication where there was testimony that defendant appeared impaired when a detective arrived at his house, but defendant offered no evidence to show that he was voluntarily intoxicated at the time of the killing and the pathologist opined that the victim had been dead for at least twenty-four hours when officers found the body.

**4. Sentencing— capital—proportionality**

A sentence of death was not disproportionate where the record supports the aggravating circumstance found by the jury, there is nothing to suggest that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and this case was more similar to cases in which the death penalty was found proportionate than to those where it was found disproportionate. Defendant was convicted based upon premeditation and deliberation, the jury found the especially heinous, atrocious or cruel aggravating circumstance, the crime was brutal and there is evidence that the victim was conscious and suffered as she died, and defendant showed no apologetic or ameliorative conduct.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Albright, J., on 2 March 1999 in Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 March 2000.

STATE v. THIBODEAUX

[352 N.C. 570 (2000)]

*Michael F. Easley, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*David B. Freedman and Dudley A. Witt for defendant-appellant.*

ORR, Justice.

Defendant was indicted 20 July 1998 for the first-degree murder of his wife, Bertha Annette (Hyatt) Thibodeaux, and was tried capitally in Superior Court, Forsyth County. On 25 Feb. 1999, the jury returned a guilty verdict of first-degree murder on the basis of premeditation and deliberation and, on 2 March 1999, a recommendation of death for defendant. Judgment was entered accordingly, and defendant gave notice of appeal to this Court on 2 March 1999.

After consideration of the questions presented by defendant, and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we find no error meriting reversal of defendant's conviction or sentence.

Defendant and the victim, Annette Thibodeaux, resided at 204 Barney Road in High Point, Forsyth County, North Carolina. Members of the High Point Police Department were sent to their home on 13 April 1998 after an out-of-town caller had contacted police and expressed concern that he was unable to reach the couple. Police arrived at the Thibodeaux home at approximately 10:00 p.m.

After observing the home for an hour, police approached and knocked on the door several times. When defendant answered, the officers standing at the doorway could see in clear view what appeared to be a woman lying face down between two couches in the living room. Also visible were what appeared to be blood stains on the walls and both couches. Based upon these observations, the police asked defendant to step outside, and they began to search the residence.

After placing defendant in a patrol car, Forsyth County Sheriff's Detective Dwayne V. Hedgecock advised defendant that law enforcement officers were there because there was a dead body in his house. In trial testimony, Detective Hedgecock described his subsequent conversation with defendant thusly:

"He said, 'A dead body is in my house?' He asked me who was in the house and I replied, 'A female.' He said, 'You mean a woman?' And I replied, 'yes.' He looked at me in a very puzzled manner

when he asked about the body . . . . He asked me again why I was there and if I was a police officer. I told him that I was a detective with the Forsyth County Sheriff's Office and that I was there to investigate what had happened. He again asked me if there was a dead woman in his house, and I said, 'Yes, Ray, there is.' He said, 'You're kidding me.' I said, 'No, Ray, I'm not kidding you.' "

At the same time inside the Thibodeaux home, Forsyth County Sheriff's Deputy Robert Shinault, Jr., examined the body of the victim, noting there was a hole in the back of her skull and that her hands were severely bruised and discolored. He also found a phone cord wrapped around her neck.

Police Detective Elizabeth Culbreth, also on the scene, testified that she discovered a white trash bag in a box in the corner of the dining room. It contained a telephone that appeared to have blood on it. In the spare room, she saw a shirt that appeared to have blood on it. Detective Culbreth also noted a number of beer cans in the garbage bag and other cans around the house.

When Detective Hedgecock entered the house and went into the bedroom, he observed that the mattress and box spring of the bed had been pulled away, exposing the floor underneath. He also observed that the area immediately surrounding the victim was covered with blood splatter, and that there were faint footsteps in blood trailing from the bedroom into the kitchen.

North Carolina State Bureau of Investigation Special Agent Jennifer A. Elwell, who was employed as a forensic serologist, testified as to a number of items of evidence seized in the investigation. The shirt found in the spare room of the home showed the presence of human blood, as did the aforementioned telephone. A watch found in the bathroom and the tissue paper it was wrapped in were also examined for blood tracings. The tissue reacted positively to phenolphthalein, the chemical used to test for human blood. A small stain on the watch, as well as two shade-control rods found in the living room, also tested positive for human blood. Agent Elwell testified that a hammer found at the scene also contained traces of human blood on its surface.

Forsyth County Sheriff's Sergeant Darrell O. Hicks was tendered and accepted at trial as an expert in the field of latent fingerprint identification. Sgt. Hicks used an original fingerprint card of defendant as a comparison to prints lifted from the crime scene. He con-

cluded that the bloody fingerprints taken from the two shade-control rods and telephone were those of defendant. He further testified that there were no fingerprints found on the hammer, and that it appeared to have been wiped clean.

North Carolina State Bureau of Investigation Special Agent David Freeman was tendered and accepted as an expert in the field of forensic DNA analysis. Agent Freeman examined the evidence and concluded that the blood located on the hammer and tissue paper matched the DNA profile of the victim. He also testified that blood samples taken from the shirt, telephone, and watch all had a DNA pattern consistent with that of the victim.

On appeal to this Court, defendant brings forward twelve questions for review. For the reasons stated herein, we conclude that defendant's trial and capital sentencing proceeding were without prejudicial error and that the death sentence is not disproportionate.

[1] Defendant's first four questions presented before this Court relate to a prior civil domestic violence protective order hearing pursuant to N.C.G.S. § 50-B ("50-B hearing"), in which the victim, Ms. Thibodeaux, testified against defendant concerning a violent assault that took place in February 1997. Generally, defendant contends that the trial court's admission of the victim's testimony from the 50-B hearing is hearsay evidence and, as such, violates defendant's right to confront the witness against him as guaranteed by both the Sixth Amendment to the United States Constitution and Article I, § 23 of the North Carolina Constitution. Defendant asserts that the trial court erred under Rules 804(b)(1), 804(b)(5, 803(3), 404(b), and 403 of the North Carolina Rules of Evidence in allowing the State to introduce into evidence the transcript and audiotape testimony of the victim from the 50-B hearing. We disagree with defendant's contention. As discussed below, we further note that defendant failed to raise the Rule 804(b)(1) objection at trial. Thus, this argument is deemed waived. *See* N.C. R. App. P. 10(b)(1).

On 3 February 1997, at the 50-B hearing held in District Court, Guilford County, Judge Susan Bray presiding, Ms. Thibodeaux described defendant's alleged violent assault in part as follows:

[H]e came into the living room where I was eating and he didn't say anything, he walked up and he slapped the plate of food out of my lap, and it went flying across the living room. And it smashed into the fireplace, and food got everywhere.

**STATE v. THIBODEAUX**

[352 N.C. 570 (2000)]

And so, of course, I became quite upset that that happened . . . . I went into the bedroom to change my shirt to get ready to leave, and he comes running into the bedroom, and he shut—we have two doors that access our bedrooms, one is into a hallway, a long hallway, because our bedroom is at the back of the house, and one door leads into a bathroom.

And he shut both doors, so that I could not escape, and he started hitting me with his fists, and I fell on the floor, and he started kicking me.

. . . .

. . . [H]e hit me with his fist on this side of my face, this has been over a week, so some of the swelling has gone down, and the bruises have began [sic] to clear up. But he hit me with his fist on this side of the face. This side of my face was swollen. I had a very severe black eye all under here.

He kicked me repeatedly over my entire body. I have some really bad bruises right here.

. . . .

. . . I got extremely scared because of the fact that this has been—this has happened to me on three other occasions, and my husband, when he gets angry he gets violent. And on the other occasions it's not like he gets upset and hits me a couple of times, and then it's over, I am used to the continual kicking, and the continual hitting, and I became very afraid.

I tried several times to get out one door that leads to the hallway, and every time I would turn for that door he would grab me and throw me down and start kicking me some more. And then when I would try to get toward the other door, he would grab me and throw me down.

And I began to realize that this was going to turn into a long ordeal, and that I was not going to escape. So, I figured if I can't get out of this bedroom, the only recourse I have is to get under the bed.

So, I went under the bed. And our bed is like very low to the floor. It's a very tight space I could crawl under. I just had to do the best I could and slide under. And where I was positioned

under the bed the frame work of the bed had, I was like pinned under the frame because I couldn't move.

And during the course of the event, this is about, approximately, a three hour ordeal, he told me that he was going to kill me. And at one point I said, "Well, Ray, you can kill me," you know, "But they are going to trace it to you, they are going to find out you did it."

And he said, "No they won't, because I will kill you. I will put your body in the trunk of your car, and I will get rid of your car, and they'll never know it was me."

And then at another point he says, "Annette, you're going to stay under that bed, and you're going to die under the bed, because I don't"—this happened Thursday night, and he didn't have to go back to work until Sunday night, and he said, "You're going to be under that bed for days, and you're going to die under the bed, because you're going to starve to death, and you're going to have to go to the bathroom on yourself."

And that's not the way he put it, but that's what it—what he was saying. And he said, "I've been sleeping for a while, and I'm refreshed, and I'm ready to go." So, I knew what he meant, he had had plenty of rest, and he had plenty of sleep. He had slept for several days, after coming off his job, so he was ready to have the energy to do what he was going to do.

And I kept asking him, I said, "Ray, why are you doing this to me?", and he kept saying, "Because you deserve it." He said, "I'm tired of your nagging me, and this is what you deserve."

And I said, "Well, Ray, I, I understand that you're angry at me, because I just told you I want to leave you," I said, "But—and you have a right to be angry," but I said, "hurting me is not the way to solve the problem, we should—if you're hurt that I told you I wanted to leave, then you should—we should just sit down and talk about this and work it out, and not—you don't hit me because you're angry."

And he said that it was his right to have the revenge.

Ms. Thibodeaux proceeded to explain in detail the manner in which defendant abused her during that evening. She testified that defendant next instructed her to take her shoes off, threatening her

by holding a dumbbell over her head and stating, " 'If you don't do what I say I will smash your skull in, and by the time I get through with you, you won't have a face.' " After she realized that he was going to tie her feet up, she retreated again to the area underneath the bed.

Ms. Thibodeaux testified that over the course of the next several hours, as she remained under the bed, defendant swung at her with a butcher knife, removed the mattress and poured boiling water on her, and "jabbed" at her with a mop handle and a steel weight lifting bar, resulting in extensive bruising to her legs and ankles. Ms. Thibodeaux stated that defendant eventually "just snapped out of it" and ended the assaultive conduct later that night.

Prior to defendant's trial in February 1999 for the murder of Ms. Thibodeaux, defendant filed a motion and an attached memorandum of law objecting to the State's introduction of the 50-B hearing transcript. In the motion and memorandum, defendant specifically objected to the admission of this evidence based on the North Carolina Rules of Evidence 803(3), 804(b)(5), and 404(b), but failed to object under Rule 804(b)(1). Moreover, during the trial court's evidentiary hearing on defendant's motion, defendant again failed to specifically object to the transcript and audiotape's admission into evidence based on Rule 804(b)(1). The trial court ultimately held the challenged hearsay statements to be admissible under Rules 804(b)(1), 804(b)(5), 803(3), 404(b), and 403.

During the trial, defendant merely reiterated his earlier objections to the aforementioned evidence, again failing to object on the Rule 804(b)(1) ruling. Thus, in the absence of a specific objection premised on Rule 804(b)(1), defendant has failed to properly preserve the issue for appellate review. *See* N.C. R. App. P. 10(b)(1). Accordingly, defendant is precluded from raising it for the first time on appeal. "This Court will not consider arguments based upon matters not presented to or adjudicated by the trial tribunal." *State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991).

As to defendant's arguments under Rules 804(b)(5), 803(3), 404(b), and 403, upon examining the record on appeal, we find that the hearsay statements in question constitute, and are admissible as, statements of the declarant's then-existing mental, emotional, or physical condition pursuant to Rule 803(3). "In general, hearsay evidence is not admissible. However, Rule 803(3) of the North Carolina Rules of Evidence allows the admission of hearsay testimony into evi-

dence *if it tends to show the declarant's then-existing state of mind.* N.C.G.S. § 8C-1, Rule 803(3) (1997)." *State v. Rivera,* 350 N.C. 285, 288, 514 S.E.2d 720, 722 (1999) (citation omitted).

It is well established in North Carolina "that a murder victim's statements that she fears the defendant and fears that the defendant might kill her are statements of the victim's then-existing state of mind and are " 'highly relevant to show the status of the victim's relationship to the defendant.' " *State v. Crawford,* 344 N.C. 65, 76, 472 S.E.2d 920, 927 (1996) (quoting *State v. Alston,* 341 N.C. 198, 230, 461 S.E.2d 687, 704 (1995), *cert. denied,* 516 U.S. 1148, 134 L. Ed. 2d 100 (1996))." *State v. Hipps,* 348 N.C. 377, 392, 501 S.E.2d 625, 634 (1998). In the instant case, the victim's testimony from the 50-B hearing clearly relates to her relationship with her husband as well as to her fear of him. "We consistently have allowed evidence spanning the entire marriage when a husband is charged with murdering his wife in order " 'to show malice, intent, and ill will toward the victim.' " *State v. Lynch,* 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990) (quoting *State v. Braswell,* 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985)). . . . Therefore, evidence of the entire pattern and history of violence between defendant and the victim was relevant." *State v. Murillo,* 349 N.C. 573, 591, 509 S.E.2d 752, 763 (1998), *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 87 (1999).

Although Rule 802 of the North Carolina Rules of Evidence provides that "[h]earsay is not admissible except as provided by statute or by these rules," we conclude that the statements complained of were properly admitted as expressions of the victim's then-existing state of mind, pursuant to Rule 803(3). Rule 803(3), therefore, satisfies the exception requirement of Rule 802. As such, it is unnecessary for us to decide whether the contested evidence is also admissible under Rules 804(b)(5).

Defendant also argues that the trial court erred in allowing these hearsay statements into evidence under Rule 404(b) because the prejudicial effect of the statements substantially outweighs their probative value. *See* N.C.G.S. § 8C-1, Rule 403 (1999). We disagree. The admissibility of specific acts of misconduct by a defendant is governed by Rule 404(b), which provides:

(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1999). In applying Rule 404(b), this Court has repeatedly held that "[t]estimony about a defendant-husband's arguments with, violence toward, and threats to his wife are properly admitted in his subsequent trial for her murder." *Murillo*, 349 N.C. at 591, 509 S.E.2d at 762; *see also State v. Syriani*, 333 N.C. 350, 376-78, 428 S.E.2d 118, 132, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

When such testimony is ruled admissible at trial under Rule 404(b), it nevertheless remains subject to the balancing test of Rule 403. "The responsibility to determine whether the probative value of relevant evidence is outweighed by its tendency to prejudice the defendant is left to the sound discretion of the trial court." *Alston*, 341 N.C. at 231, 461 S.E.2d at 704. In the case *sub judice*, the trial court carefully considered the probative value of the transcript and audiotape as well as its prejudicial effect. During the hearing on this evidence, the trial court made specific findings of fact and concluded, "[U]pon a fair consideration of the nature of the evidence and the purposes for which the evidence may be received and upon consideration of the long line of cases that admit the entire history of the marriage to prove malice and intent and ill will, matters of that sort toward the victim, the Court is of the opinion and finds that the probative value of this testimony substantially outweighs any danger of unfair prejudice, confusion of the issues, or misleading of the jury, that the evidence should not be excluded."

Abuse of the trial court's discretion will be found only where the ruling is "manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *Syriani*, 333 N.C. at 379, 428 S.E.2d at 133. Such is not the case here. Therefore, we hold that the trial court properly admitted these hearsay statements into evidence.

[2] In his next four questions presented, defendant argues that the trial court erred in allowing into evidence various witnesses' testimony about the victim's relationship with her husband, the defendant, and that such testimony was substantially more prejudicial than probative under Rule 403. Specifically, defendant argues that: (1) "[t]he trial court erred in allowing exhaustive evidence recounting statements made by the victim under Rule 803(3) as said statements

were not expressions of fear or otherwise emotion-based, but rather were mere recitations of fact"; (2) "[t]he trial court erred in allowing evidence under the residual hearsay exception of 804(b)(5) pertaining to unavailable witnesses when said evidence did not possess equivalent circumstantial guarantees of trustworthiness or was provable by other means"; (3) "[t]he trial court erred in allowing exhaustive propensity and character evidence of [defendant] under the guise of Rule 404(b) evidence"; and (4) "[t]he trial court erred in admitting evidence that was either irrelevant under Rule 401 or more prejudicial than probative under Rule 403 and as a result of the cumulative effect of the admission of said prejudicial evidence, the jury verdict was rendered under the influence of passion or prejudice and was arbitrary and capricious."

Through these arguments, defendant contends that the trial court erred in allowing the testimony of witnesses Deputy Robert Shinault, Jr.; attorney Georgia Nixon; Laura Teachey; Danny Dotson; and Officer Amber Goforth Blue under the Rule 803(3) then existing state of mind or emotion hearsay exception. We note, however, that a review of the transcript pages to which defendant cites in support of his argument as to Laura Teachey discloses that defendant mistakenly confused the witnesses' names and that the contested testimony is actually that of Robin Medley rather than that of Laura Teachey. Defendant also contends that the respective testimonies of Dotson, Medley, and Teachey were improperly admitted under Rule 804(b)(5). Further, defendant asserts that the trial court erred in admitting statements made by Deputy Shinault, Nixon, Judge Susan Bray, and Officer Blue as improper character evidence under Rule 404(b). In a separate but related argument, defendant asserts that the admission of Nixon's testimony was improper as it violated the victim's attorney-client privilege.

We note at the outset that although defendant objected as each of the aforementioned witnesses was called to testify at trial, he failed to substantively object during any portion of their testimonies to which he now assigns error. The transcript reveals that defendant objected to the designated witnesses as the State called them to testify, but did so only before the witnesses took the stand. Each time, the trial judge removed the jury from the courtroom and considered both the attorneys' forecast of evidence to be offered by the respective witness and the legal arguments surrounding the proffered testimony. After each of these conferences, the trial court made specific findings and found the forecasted testimony to be admissible under

various rules of evidence. The trial judge then instructed the jury to return to the courtroom and allowed each witness, in turn, to testify. During the testimony of each of the above witnesses, defendant failed to substantively object to their specific testimony as it was being introduced.

For example, when the State called Officer Blue to testify, defendant initially objected. During subsequent arguments out of the jury's presence, defendant's attorney predicated his objections on what he anticipated the witness would say, i.e.,"it is my understanding that the witness will testify about . . .," and "I believe she'll testify as to what Annette Thibodeaux had said . . ." After the State responded by arguing, in essence, that the proffered evidence was admissible under Rules 803(3) and 404(b), the trial court ruled for the State and allowed Officer Blue to be called as a witness.

During Officer Blue's direct examination, defendant made no objections to any of her actual testimony. The trial transcript also shows that witnesses Shinault, Nixon, Medley, and Teachey each appeared under similar circumstances, and that each testified without substantive objection by defendant. Although no objection or argument preceded the testimony of Danny Dotson, defendant made only two objections during the course of his testimony, neither of which related to hearsay or substantial prejudice.

Here, the arguments preceding the calling of the witnesses during trial were tantamount to motions *in limine*. We therefore will apply established principles relating to motions *in limine*. It is well settled that " '[a] motion *in limine* is insufficient to preserve for appeal the question of the admissibility of evidence if the defendant fails to further object to that evidence at the time it is offered at trial.' " *State v. Bonnett*, 348 N.C. 417, 437, 502 S.E.2d 563, 576 (1998) (quoting *State v. Conaway*, 339 N.C. 487, 521, 453 S.E.2d 824, 845, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995)) (alteration in original), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999); *see also* N.C. R. App. P. 10(b)(1). Thus, in order to preserve for appeal the question of the admissibility of evidence offered by a witness, defendant must make an objection to such evidence *at the time it is actually introduced* at trial. As with motions *in limine*, it is insufficient for defendant to premise his objection on matters and evidentiary issues that he merely anticipates will be discussed by a prospective witness. Moreover, it is of no consequence if the witness' actual testimony substantively coincides with counsel's preliminary assumptions. For purposes of appeal preservation, objections to testimony must be

contemporaneous with the time such testimony is offered into evidence. *See* N.C. R. App. P. 10(b)(1); *and State v. Eason*, 328 N.C. 409, 420, 402 S.E.2d 809, 814 (1991). The record shows that defendant failed to do so. Therefore, we find his arguments on these questions must fail. Additionally, as defendant has not alleged plain error in his arguments to this Court, he has waived appellate review of these issues on such grounds. *See* N.C. R. App. P. 10(c)(4); *and State v. Frye*, 341 N.C. 470, 496, 461 S.E.2d 664, 677 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996).

Although defendant offers separate arguments with regard to the respective testimonies of attorney Georgia Nixon and Judge Susan Bray, we find his contentions fail for the reasons set forth above. As for Judge Bray, defendant by reference expressly incorporates his prior arguments premised on hearsay and its potential prejudicial effect. Again, however, defendant failed at trial to object to Judge Bray's statements at the time they were introduced into evidence. Thus, he has waived his right to appellate review on the issue. The same applies to defendant's separate argument regarding the testimony of Nixon. Although defendant premises his argument here on a different legal principle—namely, that Nixon's testimony violated the attorney-client privilege—he again failed to object to her testimony in a timely manner. As a result, the substance of his argument is beyond the purview of this Court.

[3] In his next question presented, defendant claims that the trial court committed reversible error by failing to submit second-degree murder based on voluntary intoxication. We disagree. Second-degree murder is defined as "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). A defendant is entitled to have "a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense." *Id.* When the State's evidence establishes "each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration." *Id.* Moreover, if there is no evidence of intoxication, "the court is not required to charge the jury thereon." *State v. Strickland*, 321 N.C. 31, 41, 361 S.E.2d 882, 888 (1987). "The *presence of such evidence* is the determinative factor." *State v. Hicks*, 241 N.C. 156, 159, 84 S.E.2d 545, 547 (1954).

More specifically, this Court has stated:

> A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

*State v. Williams*, 343 N.C. 345, 365, 471 S.E.2d 379, 390 (1996), *cert. denied*, 519 U.S. 1061, 136 L. Ed. 2d 618 (1997).

In the present case, defendant has failed to present any evidence to support an instruction for second-degree murder based on voluntary intoxication. Defendant relies primarily on Detective Hedgecock's testimony that, on 13 April 1998, soon after the detective arrived at the Thibodeauxs' residence, defendant appeared to have consumed a large quantity of alcohol, and based upon the detective's opinion and experience, defendant appeared impaired. Defendant, however, offers no evidence to show that he was voluntary intoxicated *at the time of the killing*. To the contrary, based on the autopsy results and the decomposition of the victim's body, the pathologist opined that Ms. Thibodeaux had been dead for at least twenty-four hours when officers discovered her body on 13 April. Therefore, defendant's evidence is insufficient to mandate an instruction on the issue of whether defendant was so voluntarily intoxicated at the time of the killing that he was incapable of forming a deliberate and premeditated intent to kill. Thus, the trial court properly refused to submit an instruction on second-degree murder, and this argument is overruled.

[4] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we must now turn to the record and determine: (1) whether the record supports the aggravating circumstance found by the jury and upon which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See* N.C.G.S. § 15A-2000(d)(2) (1999).

After thoroughly reviewing the record, transcripts, and briefs in this case, we conclude that the record fully supports the jury's finding of the aggravating circumstance that the crime was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). Further, we conclude that nothing in the record suggests that defendant's death sentence in this case was imposed under the influence of passion, prejudice, or any other arbitrary factor. We must now turn to our final statutory duty of proportionality review.

One purpose of our proportionality review is "to eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee,* 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Our review also serves as a guard "against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980).

We begin our proportionality analysis by comparing this case with other cases in which this Court has concluded that the death penalty was disproportionate. *See State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We have found the death penalty disproportionate in seven cases. *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Here, defendant was convicted of murder on the basis of premeditation and deliberation. In three of the cases found disproportionate by this Court—*Benson, Stokes,* and *Rogers*—the defendants were convicted solely on the basis of the felony murder rule. That the jury convicted defendant under the theory of "premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Finally, the jury found the aggravating circumstance that the murder was espe-

cially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). Of the cases in which this Court found the death penalty to be disproportionate, the jury found the especially heinous, atrocious, or cruel aggravating circumstance in only two cases. *Stokes*, 319 N.C. 1, 352 S.E.2d 653; *Bondurant*, 309 N.C. 674, 309 S.E.2d 170. The defendant in *Stokes* was convicted solely on the basis of the felony murder rule, whereas defendant in the instant case was convicted of premeditated and deliberate murder. The defendant in *Bondurant* exhibited the kind of conduct that this Court has recognized as ameliorating. *State v. Flippen*, 349 N.C. 264, 278, 506 S.E.2d 702, 711 (1998), *cert. denied*, 526 U.S. 1135, 143 L. Ed. 2d 1015 (1999). However, in the case *sub judice*, defendant showed no such apologetic or ameliorative conduct. The crime committed by defendant in this case was equally as brutal as other murders for which a death sentence was imposed. Additionally, there is evidence that the victim suffered before she died, and that she was conscious during at least part of her attack. The victim's hands were discolored and swollen. The left hand had twelve separate broken bones, and the right hand had similar injuries. These wounds were defensive-type wounds received while the victim was conscious as she tried to ward off blows to her head. The victim suffered six to eight individual contusions to the left side of her head, and six to eight abrasions on the back of her neck, with associated bruises. She sustained fifty to seventy-five discrete blows to the head, as well as a hole in her skull resulting from a blow with a hammer. This blunt trauma to the head was the victim's ultimate cause of death. The pathologist described the multitude of injuries to the victim as "overkill."

It is also proper to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. In addition, while it is important for this Court to review all the cases in the pool when engaging in our duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It is sufficient to state that we have concluded that the instant case is more similar to cases in which we have found the death penalty proportionate than to those in which we have found the sentence of death disproportionate.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was either excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of preju-

**STATE v. THIBODEAUX**

[352 N.C. 570 (2000)]

dicial error. Accordingly, the judgment of the trial court must be and is left undisturbed.

NO ERROR.