An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-218

NORTH CAROLINA COURT OF APPEALS

Filed:  21 January 2014

STATE OF NORTH CAROLINA

v.

Orange County
Nos. 08 CRS 930-31, 512

BRIAN GREGORY MINTON

Appeal by defendant from judgments entered 8 May 2012 by Judge Orlando F. Hudson in Orange County Superior Court.  Heard in the Court of Appeals 12 September 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.*
>
> *Megerian & Wells, by Franklin E. Wells, Jr., for Defendant.*

ERVIN, Judge.

Defendant Brian Gregory Minton appeals from judgments sentencing to him to a term of life imprisonment without the possibility of parole based upon his conviction of first degree murder, to a consecutive term of 116 to 149 months imprisonment based upon his conviction of first degree kidnaping, and to a consecutive term of 220 to 273 months based upon his conviction of conspiracy to commit first degree murder.  On appeal, Defendant contends that the trial court erred by allowing the

admission of evidence concerning the commission of certain other criminal acts that took place prior to and after the murder and kidnaping for which Defendant was convicted; evidence identifying Defendant as having been seen in proximity to the location at which a theft had been committed; and evidence that two witnesses had not disclosed information in their possession as a result of their fear of Defendant. After careful consideration of Defendant's challenges to the trial court's judgments in light of the record and the applicable law, we conclude that the trial court's judgments should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

Jack Johnson had been Defendant's schoolmate and long-time friend. During 2008, Defendant and Jack Johnson began committing crimes together, including a breaking or entering during which Defendant, Jack Johnson, and Jacob Maxwell stole a sound system and television.

Matt Johnson, who had heard about Defendant and wanted to go into business with him, was introduced to Defendant on or about 20 July 2008. Subsequently, Matt Johnson concocted a plan with his long-time friend, Joshua Bailey, to sell drugs in order to raise money for use in obtaining in-patient drug treatment.

In the following days, Sarah Krombach, Matt Johnson's girlfriend; Matt Johnson; Defendant; and Mr. Maxwell began spending time together. During this period, items began to go missing, with two checks and two guns having been stolen from Ms. Krombach's home and jewelry and medication having been stolen from Defendant's mother.

A week prior to the murder and kidnaping at issue in this case, Ms. Krombach informed Matt Johnson that she knew of an individual who lived in Greensboro from whom the two could purchase marijuana and took Matt Johnson to that person's residence. Later that week, Mr. Maxwell; Matt Johnson; Jack Johnson; Defendant; Mr. Maxwell's girlfriend, Chelsea Lipson; and Defendant's friend, Garry Bright, went to the Greensboro residence to rob those who were present at that location.

After the group arrived at the Greensboro residence, Jack Johnson and Mr. Maxwell stood by the front door while Ms. Lipson asked to use the telephone. Once the door to the residence had been opened, Jack Johnson and Mr. Maxwell entered the residence, armed, and demanded to be given certain items, eventually taking a PlayStation 3, an iPod, marijuana, and cash. In the course of this robbery, Mr. Maxwell struck a resident in the head with a nine-millimeter pistol and Jack Johnson struck another

individual with a .38 caliber revolver, both of which had been brought to the scene of the robbery from Defendant's home.

On 29 July 2008, Jack Johnson, Matt Johnson, Brandon Greene, Mr. Bailey, Mr. Bright, and Mr. Bright's cousin, Ryan Lee, were socializing at Mr. Bright's home. In the early afternoon, Defendant and Mr. Maxwell arrived at the Bright home and invited everyone to go to Defendant's home in order to consume alcohol and drugs. At the time that Mr. Maxwell, Mr. Bright, and Jack Johnson arrived at Defendant's home, Ms. Lipson was already present, while Ms. Krombach arrived a short time later.

After an initial period of socializing, Defendant and Ms. Krombach went outside for a brief period of time. Upon their return, the group began discussing the items that had previously been stolen and realized that Defendant, Ms. Krombach, and Jack Johnson were all missing items, including the PlayStation 3 which had been acquired during the Greensboro robbery. In addition to the guns and checks that had been stolen from the Krombach home and the jewelry and medication that had been stolen from Defendant's mother, Jack Johnson was missing marijuana and the iPod that had been stolen from the Greensboro residence and Defendant's father was missing a pair of sunglasses.

Initially, the members of the group suspected that Matt Johnson had stolen the missing items. After Ms. Krombach suggested that the group confront Matt Johnson, Defendant stated that he could arrange such a confrontation. At that point, Defendant and Jack Johnson returned to Mr. Bright's residence to pick up Matt Johnson, having told him that they were just going to "hang" at Defendant's home. Although Matt Johnson asked Mr. Lee for a ride to the store prior to his departure for Defendant's residence, Ms. Lipson stopped Mr. Lee from complying with this request, telling Mr. Lee that Matt Johnson was a "snitch" and indicating that she would give Matt Johnson a ride. At that point, Defendant drove everyone except Mr. Lee and Mr. Bailey to his residence.

Before arriving at Mr. Bright's house, Defendant and Jack Johnson had already decided that, if Matt Johnson was guilty of the thefts in question, he deserved to be assaulted. After Matt Johnson reached Defendant's residence, the group interrogated him vigorously, asking him if he was working with the police and accusing him of stealing the missing items. According to Jack Johnson, Defendant handed Mr. Greene a .38 caliber revolver during the questioning.

In response to this questioning, Matt Johnson indicated that Mr. Bailey was the real culprit. At that point, Defendant

had Mr. Bailey come to his residence. In addition, Mr. Lee honored a request that he accompany Mr. Bailey to the garage. As soon as Mr. Bailey arrived at the garage, Mr. Bright attacked him before being restrained by Jack Johnson and Mr. Greene. Mr. Bright claimed to have attacked Mr. Bailey because he was scared and did not want the group to think of him as an informant.

After having been beaten and questioned about being a "snitch," Mr. Bailey denied having given the police any information. He did, however, admit that he knew about the theft of the guns and checks from the Krombach residence and indicated that this theft had been Matt Johnson's idea. Although Defendant did not directly question either Mr. Bailey or Matt Johnson, he was upset by the fact that both men maintained their innocence. As a result, after pulling out a nine-millimeter pistol and stating that, if the group's questions were not answered, someone would be shot and taken out into the country,[1] Defendant proposed that Mr. Bailey and Matt Johnson should fight each other, with the loser "tak[ing] a long ride to the country." Although Mr. Bailey and Matt Johnson "wrestled" for a brief period of time, nothing much came of their struggle. However, because Mr. Bailey was confused and

---

[1] Mr. Lee denied having witnessed Defendant waving a gun in the air or hearing any discussion to the effect that Mr. Bailey would be killed.

disconcerted and Matt Johnson defended himself more effectively than Mr. Bailey during interrogation, the group focused on Mr. Bailey instead of Matt Johnson.

In an attempt to bring this dispute to a conclusion, Ms. Krombach invited everyone to return to her residence and left, along with Ms. Lipson and Mr. Bright, to make an apple pie at that location. After Ms. Krombach, Ms. Lipson, and Mr. Bright departed, Defendant told Mr. Maxwell to duct tape both Mr. Bailey and Matt Johnson. As a result, Mr. Bailey's hands were zip tied and duct taped, his wrists were taped together and he was placed inside a sport utility vehicle owned by Defendant's mother. Defendant drove the vehicle, with Mr. Maxwell riding in the front seat and Jack Johnson, Matt Johnson, who carried a nine millimeter handgun, and Mr. Bailey riding in the rear seat. Mr. Greene and Mr. Lee followed Defendant in a separate vehicle.

After the group traveled to the cul-de-sac in the vicinity of Mr. Maxwell's residence, they walked down a path into the woods. During that time, Jack Johnson asked Defendant what the group was going to do. In response, Defendant stated that the group was going to force Matt Johnson to kill Mr. Bailey and that, if Matt Johnson failed to act in accordance with these instructions, the group would hurt Matt Johnson. As the group traveled through the wooded area, Defendant was carrying a .38

caliber revolver while Matt Johnson was carrying the nine-millimeter handgun.

After the group arrived at the desired location, Mr. Maxwell volunteered to kill Mr. Bailey. In response, Defendant stated that Matt Johnson should kill Mr. Bailey because Matt Johnson was suspected of being a police informant. At that point, Matt Johnson shot Mr. Bailey in the head and then, after being prompted to do so by Defendant, shot Mr. Bailey in the body. At Defendant's request, the group buried Mr. Bailey.

Subsequently, Defendant and Jack Jackson returned to the site at which Mr. Bailey had been killed and buried to cover his body with additional dirt. In addition, they spread muriatic acid in the area in which Mr. Bailey had been killed. As they improved the manner in which Mr. Bailey's body had been buried, Defendant and Jack Johnson discussed the fact that Matt Johnson was missing and that he was rumored to be in a rehabilitation facility. A number of individuals, including Defendant and Mr. Bright, eventually moved Mr. Bailey's body to a second burial site out of concern about Matt Johnson's disappearance, which had caused his trustworthiness to come into question.

On 17 August 2008, Defendant approached Mr. Bright with a suggestion that they go to Pittsboro to "deal with Matt" Johnson given Defendant's concern that Matt Johnson knew too much about

the group's activities and could not be trusted. As a result of his belief that Defendant had no regard for human life, Mr. Bright had, by this time, begun to fear Defendant. In addition, Defendant contacted Ms. Krombach, told her that he wanted to speak with Matt Johnson, and obtained Ms. Krombach's agreement that she would tell him if she heard anything from Matt Johnson. As a result of her irritation about the fact that Matt Johnson had made contact with a former girlfriend, Ms. Krombach agreed to Defendant's request.

After meeting with Matt Johnson at a local restaurant, Ms. Krombach persuaded him to accompany her to her uncle's garage in Pittsboro. Once she had made this arrangement with Matt Johnson, Ms. Krombach contacted Defendant and told him that she was taking Matt Johnson to the garage, where she was instructed to keep him until everyone else arrived. At the time that Defendant, who was accompanied by Jack Johnson, Mr. Maxwell, and an individual named "Keys," arrived at the garage, he was carrying the same .38. caliber pistol that he had had in his possession on the day that Mr. Bailey had been killed.

Upon entering the garage, the group began to question Matt Johnson about their concerns that he was a police informant and about the items that had been stolen from various group members. After Matt Johnson's hands had been duct taped, Defendant beat

him with a metal object. In addition, other members of the group assaulted Matt Johnson. For example, Jack Johnson wrapped a chain around Matt Johnson's neck. Eventually, Matt Johnson confessed that he had the PlayStation 3 gaming system that had been taken in the Greensboro robbery in his possession, that the system was currently located at his mother's house, and that he was willing to retrieve it.

Although the group had Matt Johnson ride with Jack Johnson and Ms. Krombach to his mother's residence for the purpose of retrieving the PlayStation, Matt Johnson was unable to enter the house because his mother was out of town. As a result, Matt Johnson stated that he would get the PlayStation on the following day after his mother returned home. Matt Johnson spent the night at Ms. Krombach's residence so that she and Jack Johnson could keep an eye on him.

On the following day, Defendant and Mr. Maxwell accompanied Matt Johnson to his mother's place of employment in an attempt to retrieve the stolen items that they wished Matt Johnson to return. Although Matt Johnson entered the office building in which his mother worked, he left after hearing that she was meeting with a client and might be occupied for as long as two hours. When he eventually made contact with his mother, Matt

Johnson told her that he needed to get out of town because Defendant was trying to kill him.

In the meantime, Mr. Bailey's father, Steve Bailey, had become concerned about the whereabouts of his son after Mr. Bailey missed seeing his grandmother before her departure for Florida and failed to acknowledge his mother's birthday, which occurred on 3 August 2008, with even a phone call. On 5 August 2008, Mr. Bailey's parents went to the Chapel Hill Police Department for the purpose of filing a missing person report. However, they were not allowed to file such a report on the grounds that Mr. Bailey was an adult. After being contacted by Evelyn Giddens, a family friend, who told him about the efforts that the Baileys had made to file a missing person report relating to Mr. Bailey, Investigator Tim Horne of the Orange County Sheriff's Department made contact with Steve Bailey and helped him to file a report concerning his son with the Orange County Sheriff's Department on 20 August 2008.

After the filing of this report, Investigator Horne gathered certain items of information concerning Mr. Bailey and entered that information into the National Crime Information Center database so that any law enforcement officer who made contact with Mr. Bailey would be aware that he had been reported missing. In addition, Investigator Horne collected the names of

certain of Mr. Bailey's friends for the purpose of speaking with them and obtained the issuance of a silver alert relating to Mr. Bailey based on the fact that Mr. Bailey had certain cognitive impairments.

As he attempted to locate Mr. Bailey, Investigator Horne came across an incident report contained in the P2P law enforcement information sharing system that had been filed by Ms. Krombach and her father concerning the theft of firearms and certain other items from their home. According to the report in question, Defendant had aided Ms. Krombach in recovering the stolen firearms while Mr. Bailey had been listed as a suspect in the theft. At the time that she spoke with Investigator Horne on 22 August 2008, Ms. Krombach told Investigator Horne that she believed that Mr. Bailey and Matt Johnson had stolen the weapons and that Defendant assisted her in obtaining their return. On the same date, Investigator Horne spoke with Defendant, who stated that he had become involved in the return of the stolen weapons after Matt Johnson and Mr. Bailey had approached him with the stolen weapons and asked if he wanted to go use them to engage in recreational shooting.

After hearing these references to Matt Johnson during his conversations with Ms. Krombach and Defendant, Investigator Horne spoke with Matt Johnson's mother, who told Investigator

Horne that her son had recently been assaulted and kidnaped and was currently "on the run." At the time that Investigator Horne was able to speak with Matt Johnson, Matt Johnson told Investigator Horne that Defendant had claimed to have killed Mr. Bailey at a time when Matt Johnson was not present. On 10 September 2008, however, Matt Johnson informed Investigator Horne that he had been present when Mr. Bailey was killed, that Jack Johnson had actually killed Mr. Bailey, and that he could show Investigator Horne the location at which Mr. Bailey's body had been buried. On the same date, Matt Johnson took Investigator Horne to the original burial site. DNA consistent with Defendant's DNA was recovered from a latex glove found at the original burial site. After Matt Johnson admitted that he had killed Mr. Bailey, Mr. Bright showed investigating officers where Mr. Bailey's body was located.

## B. Procedural History

On 15 September 2008, warrants for arrest charging Defendant with first degree murder and first degree kidnaping were issued. On 29 September 2008, the Orange County grand jury returned bills of indictment charging Defendant with first degree murder and first degree kidnaping. On 4 May 2009, the Orange County grand jury returned a bill of indictment charging Defendant with conspiring to commit first degree murder and

first degree kidnaping. On 6 February 2012, the Orange County grand jury returned a superseding indictment in the first degree kidnaping case. On 18 February 2009, the State filed a notice that it intended to proceed non-capitally.

The charges against Defendant came on for trial before the trial court and a jury at the 2 April 2012 criminal session of the Orange County Superior Court. On 8 May 2012, the jury returned verdicts convicting Defendant of first degree murder on the basis of malice, premeditation, and deliberation and on the basis of the felony murder rule, with first degree kidnaping serving as the predicate felony; first degree kidnaping; and conspiracy to commit first degree murder and first degree kidnaping. On 8 May 2012, the trial court entered judgments sentencing Defendant to a term of life imprisonment without the possibility of parole based upon his conviction of first degree murder, to a consecutive term of 116 to 149 months imprisonment based upon his conviction of first degree kidnaping, and to a consecutive term of 220 to 273 months imprisonment based upon his conviction of conspiracy to commit first degree murder. The trial court arrested judgment in the case in which Defendant was convicted of conspiracy to commit first degree kidnaping. Defendant noted an appeal to this Court from the trial court's judgments.

## II. Legal Analysis

## A. Admission of "Other Crimes" Evidence

### 1. Greensboro Robbery

In his first challenge to the trial court's judgments, Defendant argues that the trial court erred by allowing the admission of evidence concerning the Greensboro robbery. According to Defendant, the trial court's decision to allow the admission of this evidence violated N.C. Gen. Stat. § 8C-1, Rule 404(b) and N.C. Gen. Stat. § 8C-1, Rule 403 and prejudiced his chances for a more favorable outcome at trial. We do not find Defendant's argument persuasive.

After describing another robbery committed by members of the group involved in the various activities underlying the charges that had been lodged against Defendant, Jack Johnson testified concerning the events that occurred at the time of the Greensboro robbery. At that point, Defendant's trial counsel objected to the admission of this testimony, adequately preserving his right to challenge the admission of this portion of Jack Johnson's testimony for purposes of appellate review. *See,* e.*g.,* *State v. Ray*, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (alteration in original) (quoting *State v. Thibodeaux*, 352 N.C. 570, 581-82, 532 S.E.2d 797, 806 (2000), *cert. denied*, 531 U.S. 1155, 121 S. Ct. 1106, 148 L. Ed. 2d 976 (2001))

(stating that, "to preserve for appellate review a trial court's decision to admit testimony, 'objections to [that] testimony must be contemporaneous with the time such testimony is offered into evidence' and not made only during a hearing out of the jury's presence prior to the actual introduction of the testimony"). Subsequently, however, Mr. Bright also testified concerning the events that took place at the time of the Greensboro robbery without drawing any objection from Defendant. "It is well established that the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Campbell*, 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979). As a result, Defendant is not entitled to relief from the trial court's judgments based upon the admission of Jack Johnson's testimony concerning the events that occurred at the time of the Greensboro robbery.

In an attempt to avoid the problem created by the fact that he did not object to the admission of the "same or similar" evidence at trial, Defendant argues that the trial court's decision to overrule his objection to the admission of Jack Johnson's testimony concerning the Greensboro robbery constituted plain error. "In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed

preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4); *see also State v. Goss*, 361 N.C. 610, 622, 651 S.E.2d 867, 875 (2007), *cert. denied*, 555 U.S. 835, 129 S. Ct. 59, 172 L. Ed. 2d 58 (2008). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial," which means that the reviewing court, "after examination of the entire record," has to conclude that "the error 'had a probable impact on the jury's finding that the defendant was guilty.'" *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983)). As a result, given that "plain error" analysis involves the use of a heightened prejudice standard and given that the admission of the "same or similar" evidence precludes an award of appellate relief based upon the admission of allegedly inadmissible evidence, a determination that the "same or similar" evidence was admitted during another portion of a defendant's trial precludes a determination that the admission of the challenged testimony constituted "plain error." *See State v. Taylor*, 344 N.C. 31, 47, 473 S.E.2d 596, 605 (1996). Thus, Defendant is not entitled to relief from the trial court's

judgments on the basis of the decision to admit into evidence Jack Johnson's testimony concerning the events that occurred at the time of the Greensboro robbery.

## 2. Pittsboro Incident

Secondly, Defendant contends that the trial court erred by denying his motion *in limine* seeking the exclusion of testimony concerning the events that occurred at the time of the group's assault upon Matt Johnson in the garage owned by Ms. Krombach's uncle. In support of this assertion, Defendant contends that the admission of this evidence violated N.C. Gen. Stat. § 8C-1, Rule 404(b) on the grounds that the events described in the challenged testimony were not sufficiently similar to the events that occurred at the time of the kidnaping and murder of Mr. Bailey. Defendant's argument lacks merit.

Although Defendant filed a motion *in limine* in which he asserted that evidence concerning the assault upon Matt Johnson should not be admitted, the filing and litigation of such a motion is not sufficient to properly preserve an issue for appellate review. On the contrary, "'[a] motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial.'" *State v. Brown*, 178 N.C. App. 189, 192, 631 S.E.2d 49, 51-52 (2006)

(quoting *State v. Grooms*, 353 N.C. 50, 65, 540 S.E.2d 713, 723 (2000), *cert. denied*, 534 U.S. 838, 122 S. Ct. 93, 151 L. Ed. 2d 54 (2001)).  After an oral motion *in limine* seeking the exclusion of any evidence concerning the assault upon Matt Johnson, Defendant failed to renew this objection when the challenged evidence was presented before the jury through the testimony of Jack Johnson.  As a result, Defendant failed to preserve his challenge to the admission of evidence concerning the assault upon Matt Johnson for purposes of appellate review, a fact which precludes us from granting Defendant any relief from the trial court's judgments stemming from the admission of this evidence.[2]

## B. Contents of P2P Report

[2]Although Defendant alleged that the admission of evidence concerning the Greensboro robbery constituted plain error, he failed to advance a similar argument with respect to the evidence concerning the assault upon Matt Johnson.  As a result, given that a party is only entitled to relief under the "plain error" doctrine if he or she "specifically and distinctly contended [the alleged error in question] to amount to plain error," N.C.R. App. P. 10(a)(4), we will not address the issue of whether the admission of the testimony that is the subject of this portion of our opinion constituted "plain error."  *E.g.*, *State v. Roache*, 358 N.C. 243, 292, 595 S.E.2d 381, 413 (2004) (quoting *Grooms*, 353 N.C. at 65-66, 540 S.E.2d at 723) (stating that, since "a motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial" and since the defendant "neither assigned nor argued plain error as to the admission of [the] evidence," the issue in question was "not properly before the Court").

Thirdly, Defendant argues that the trial court erred by admitting evidence contained in a police report that tended to show that Defendant was in the vicinity at approximately the same time that certain items were stolen from the Krombach residence. According to Defendant, the evidence in question constituted inadmissible hearsay and was admitted in violation of his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Once again, we are not persuaded by Defendant's argument.

On redirect examination, Investigator Horne testified that a P2P report indicated that, at the time of a theft that took place at the Krombach residence, a neighbor reported having seen Defendant walking with four other men in the vicinity of the neighbor's home. At trial, Defendant argued that the evidence in question constituted inadmissible hearsay, involved a description of the contents of a report that had not been admitted into evidence,[3] and violated the confrontation-related principles enunciated in the decision of the United States

---

[3]As a result of the fact that the report in question was admitted into evidence and the fact that Defendant has not advanced this aspect of the argument that he made in the court below on appeal, we need not address the extent to which the admission of the challenged testimony allowed the presentation of information contained in a document that had not been admitted into evidence.

Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

According to well-established state and federal law, even errors of constitutional dimension are, in most instances, subject to a harmless error analysis. *State v. Thomas*, 134 N.C. App. 560, 570-71, 518 S.E.2d 222, 229-30, *disc. review denied*, 351 N.C. 119, 541 S.E.2d 468 (1999). A careful review of the record presented for our consideration convinces us that, even if the trial court erred by admitting evidence that Defendant was in the vicinity of the Krombach residence at the time of the theft in question, any such error would have been harmless beyond a reasonable doubt. N.C. Gen. Stat. § 15A-1443(b).

In seeking to persuade us that the admission of the challenged evidence constituted prejudicial error, Defendant argues that this evidence amounted to an attack upon his character. Although the report made reference to a statement by a neighbor to the effect that Defendant was in the area at the time of the theft in question, nothing in the report suggested that Defendant was suspected of having been involved in the theft itself. Instead, the record developed at Defendant's trial consistently indicated that Mr. Bailey and Matt Johnson were responsible for stealing the firearms that were taken from the Krombach residence and that Defendant had actually aided in

the recovery of the firearms.  As a result, in light of the incidental nature of the reference to Defendant in the report in question, the fact that the remainder of the record tends to show that Defendant was not involved in the theft in question, and the overwhelming evidence of Defendant's guilt, we conclude that any error that the trial court might have committed by allowing the admission of testimony to the effect that Defendant had been seen in the vicinity of the Krombach residence at the time that certain items were stolen from that location was harmless beyond a reasonable doubt.

## C. Opinion Testimony

Finally, Defendant contends that the trial court erred by allowing the admission of testimony by Jack Johnson and Ms. Lipson to the effect that they were afraid of Defendant and that Defendant and his family had a reputation for engaging in violent conduct.  According to Defendant, the evidence in question constituted impermissible hearsay and improperly attacked Defendant's character.[4]  We do not believe that Defendant's argument has any merit.

---

[4]Although Defendant's brief contains an initial reference to his belief that the challenged statements constituted inadmissible hearsay, he has failed to make any hearsay-related argument in his brief directed to the testimony at issue in this section of our opinion.  As a result of that fact, we will refrain from commenting any further upon this issue.

On direct examination, Jack Johnson was asked to explain why he had initially lied to investigating officers about his role in the murder and kidnaping of Mr. Bailey and testified that he had lied to protect himself and other people given Defendant's statements that, since his family was connected with the "Hell's Angels," he could always "get his hands on guns." Similarly, Ms. Lipson testified that she had failed to notify investigating officers after learning of Mr. Bailey's murder because of her fear of Defendant and his family in light of Defendant's assertions that he would harm Ms. Lipson's unborn child and that his father, who had connections with the "Hell's Angels," would not let him "go down" for any crimes.

In seeking to establish that the trial court erred by allowing the admission of testimony by Jack Johnson and Ms. Lipson to the effect that they were afraid of him, Defendant relies on two cases decided by this Court. In *State v. Ward*, 93 N.C. App. 682, 683, 379 S.E.2d 251, 252-53, *disc. review denied*, 325 N.C. 276, 384 S.E.2d 528 (1989), a witness asserted that she remained afraid of the defendant at the time of trial after testifying that he had threatened to kill her and sell her child. On appeal, this Court held that the admission of the challenged testimony was erroneous on the grounds that this evidence had "no apparent relevance to this case other than to

imply the defendant was a violent person." 93 N.C. App. at 685, 379 S.E.2d at 253. Similarly, in *State v. Bell*, 87 N.C. App. 626, 636, 362 S.E.2d 288, 294 (1987) we held that the trial court erred by allowing a witness to testify that she was still afraid of the defendant "on the day she testified" on the grounds that "the only apparent relevance of [the] evidence was to imply that [the] defendant was a violent person." Neither of these cases supports the position that Defendant has asserted in this case, however.

Unlike the situations at issue in *Ward* and *Bell*, neither Ms. Lipson nor Jack Johnson testified that they were currently scared of Defendant. In addition, their testimony was relevant for a purpose other than portraying Defendant as a violent person. For example, Jack Johnson had initially lied to investigating officers about his involvement in the kidnaping and murder of Mr. Bailey. For that reason, testimony concerning his fear of Defendant was relevant to the issue of why the jury should credit his testimony despite his initial prevarication. Similarly, the challenged portion of Ms. Lipson's testimony was admissible to explain why she had failed to come forward and provide the information in her possession concerning the kidnaping and murder of Mr. Bailey at an earlier time. *State v. Bynum*, 111 N.C. App. 845, 849, 433 S.E.2d 778, 781 (holding that

the trial court did not err by admitting evidence that a child was afraid of her father on the grounds that the challenged evidence was "probative on the issue of her hesitancy in telling her mother of the alleged abuse"), *disc. review denied*, 335 N.C. 239, 439 S.E.2d 153 (1993); *State v. Barnes*, 77 N.C. App. 212, 216, 334 S.E.2d 456, 458 (1985) (holding that the trial court did not err by admitting evidence that a child's father was "mean" on the grounds that the challenged evidence was admissible "to explain why [the child] had not told her mother about" the sexual abuse that she had suffered at her father's hands), *disc. review denied*, 315 N.C. 392, 338 S.E.2d 881 (1986). As a result, we do not believe that the trial court erred by allowing Jack Johnson and Ms. Lipson to testify concerning their fear of Defendant and the reasons that led them to be afraid of him.

In addition, we question whether Defendant has properly preserved this issue for appellate review or whether the admission of the challenged portions of the testimony of Jack Johnson and Ms. Lipson impermissibly prejudiced Defendant's chances for a more favorable outcome at trial. A number of other witnesses also testified that they were scared of Defendant. For example, Mr. Lee testified, without objection, that he had not provided information to investigating officers

out of fear of what the members of the group involved in the murder and kidnaping of Mr. Bailey, a collection of individuals which included Defendant, might do to him. Similarly, Mr. Bright described the connections between Defendant and the "Hell's Angels." Finally, Chris Manley, who helped Defendant at the time of the second burial of Mr. Bailey's body, testified that he participated in this activity because he was scared. As we have already noted, "the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *Campbell*, 296 N.C. at 399, 250 S.E.2d at 231. Moreover, even if the admission of the "same or similar" evidence does not operate to preclude any consideration of the merits of Defendant's challenge to the admission of the challenged portions of the testimony of Jack Johnson and Ms. Lipson, its presence in the record coupled with the overwhelming evidence of Defendant's guilt satisfies us that there is no reasonable possibility that the outcome at Defendant's trial would have been different in the event that the trial court had sustained Defendant's objection to the testimony at issue in this section of our opinion. Thus, Defendant is not entitled to any relief from the trial court's judgments based upon the admission of testimony by Jack Johnson and Ms. Lipson concerning their fear of Defendant.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgments have merit. As a result, the trial court's judgments should, and hereby do, remain undisturbed.

NO ERROR.

Judges ROBERT N. HUNTER, JR. and DAVIS concur.

Report per Rule 30(e).