UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHERMAN ELWOOD SKIPPER,
        *Petitioner - Appellant,*

v.

R. C. LEE, WARDEN, Central Prison,
Raleigh, North Carolina,
        *Respondent - Appellee.*

No. 00-8

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Malcolm J. Howard, District Judge.
(CA-96-86-5-H-HC)

Argued: September 26, 2000

Decided: December 19, 2000

Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed by unpublished opinion. Judge Williams wrote the opinion, in which Judge Widener and Judge Michael joined.

## COUNSEL

**ARGUED:** William Stanley Mills, GLENN, MILLS & FISHER, Durham, North Carolina, for Appellant. Alana Danielle Marquis, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Gretchen Engel, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Michael F. Easley,

Attorney General of North Carolina, NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

## OPINION

WILLIAMS, Circuit Judge:

Sherman Skipper was convicted by a jury in the Superior Court of
Bladen County, North Carolina and sentenced to death on two counts
of first-degree murder for the shooting deaths of Aileen Pittman and
Nelson Fipps, Jr. The United States District Court for the Eastern Dis-
trict of North Carolina denied Skipper's petition for habeas corpus,
and Skipper now appeals, seeking relief based upon the trial court's
failure to instruct the jury on second-degree murder and the district
court's refusal to grant an evidentiary hearing to determine whether
trial counsel rendered ineffective assistance in failing to present evi-
dence of Skipper's mental retardation and diminished capacity at the
guilt phase of trial.[1] Skipper also argues that his death sentence vio-
lates the Eighth and Fourteenth Amendments' prohibition against
cruel and unusual punishment because he is mentally retarded. Find-
ing no reversible error, we affirm.

I.

On August 25, 1990, Skipper asked his friend, Mark Smith, to
drive him to the home of Aileen Pittman, Skipper's girlfriend.[2] Skip-

---

[1]Skipper originally named James B. French, former Warden of Central
Prison in Raleigh, North Carolina, as the Respondent. R.C. Lee subse-
quently succeeded French as Warden. For ease of reference, we refer to
Respondent as "the State."

[2]These facts are derived from the testimony of Smith, who is the only
living eyewitness to the murders, and from the statement of facts in the
Supreme Court of North Carolina's published opinion affirming Skip-
per's conviction on direct appeal. *See State v. Skipper*, 446 S.E.2d 252,
259 (N.C. 1994).

per asked Smith to drive in part because Skipper had been drinking, although Skipper was not visibly intoxicated and Smith did not know how much alcohol Skipper had ingested. Skipper directed Smith to Pittman's house, where Nelson Fipps, Pittman's grandson, was standing in the yard. Fipps went to get Pittman, and Skipper and Pittman talked for fifteen to twenty minutes outside of her home. After the conversation, Skipper returned to his truck, and Pittman asked Smith not to bring Skipper back to her home.

Skipper told Smith to drive away, and Smith began to back the truck out of the driveway. What Smith did not realize, however, was that Skipper had a semiautomatic rifle containing fragmentation bullets under his seat. As Smith backed the truck out of the driveway, and without provocation, Skipper pulled out the weapon and shot Pittman numerous times. He continued firing as she crouched in a doorway trying to avoid the gunfire. When Skipper stopped shooting at Pittman, he turned and pointed his rifle at Fipps, yelled "you, too," and then shot Fipps several times. Both Pittman and Fipps died of multiple gunshot wounds. Pittman's body had more than thirty wounds, and Fipps' body had two. As they drove away from the scene of the brutal murders, Skipper confirmed with Smith that he "g[o]t them." (J.A. at 242.)

Skipper then directed Smith to a wooded area, where Skipper hid the gun and the ammunition. Skipper and Smith left the area and went to a topless bar and then to a restaurant, where Skipper, for the first time, stated that "he didn't know why he had done it" and "was sorry he had went by there." (J.A. at 247.) When Smith told Skipper that he was going to turn himself in to the police, Skipper warned him of the consequences, telling Smith that he would "g[e]t twenty years" in prison for his part in the murders. (J.A. at 256.) Skipper and Smith evaded capture by traveling to Virginia for several days and then to Florida. Smith later turned himself in and told the police where to find Skipper.

Prior to trial, Skipper's trial counsel requested a neuropsychological evaluation from Dr. Antoni Puente, a Ph.D in neuropsychology, who concluded that Skipper appeared to have "a longstanding history that suggests problems of a learning disability nature in school, criminal, alcohol, and interpersonal limitations since that period." (J.A. at

87.) Dr. Puente also opined that Skipper suffered from organic brain damage and was mildly mentally retarded, with an I.Q. "slightly above and below the cutoff for mild mental retardation." (J.A. at 87.)

Despite gathering evidence of Skipper's mental impairment, however, trial counsel chose not to present this evidence at the guilt phase of trial. The State's case against Skipper was built on Smith's testimony that Skipper was the killer; Skipper did not testify, and Smith was the only living eyewitness to the crime. Indeed, the police did not obtain fingerprints or other physical evidence that might have proved the perpetrator's identity and supported the State's theory of the case. As a result, the State's case largely turned upon Smith's credibility. Consequently, and not surprisingly, trial counsel sought to undermine the State's evidence that Skipper was the killer by implying that Smith was fabricating his testimony in order to conceal his own guilt and by presenting testimony suggesting that an unidentified third party might have actually murdered Pittman and Fipps. Among other things, trial counsel impeached Smith's credibility by arguing that Smith was able to avoid imprisonment by testifying against Skipper, and trial counsel offered evidence that Smith had previously been convicted of other crimes[3] and that Smith initially lied about his role in the murder by claiming that Skipper had held him hostage for a week. Trial counsel also presented the testimony of Debbie Edwards, who drove by Pittman's home less than an hour before the murders and who testified, contrary to Smith's testimony, that Skipper's truck was not nearby and that an unidentified man was in Pittman's yard. Trial counsel also attacked the police investigation and focused on the police's failure to seek fingerprints, soil samples, or clothing fiber on the truck or the weapon. Trial counsel also attempted to undermine the credibility of the investigation by revealing through cross-examination that the police identified Skipper as a suspect before he had even been located.

Before closing arguments, trial counsel requested jury instructions on second-degree murder and voluntary intoxication, which were both

---

[3]Trial counsel elicited on cross-examination the fact that Smith had previously been convicted of violating probation and four counts of common law forgery.

rejected by the trial court. The jury found Skipper guilty of the first-degree murders of both Pittman and Fipps.

At the sentencing phase of trial, Skipper's trial counsel offered Dr. Puente's testimony that Skipper was mildly mentally retarded, with an I.Q. of 69, and unable to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. Dr. Puente also testified that Skipper had organic brain damage and had "[a] limited ability to plan, to carry out, to understand or reflect about the serious issues in life." (TT, at 1000+635.) Despite Dr. Puente's testimony, none of the sentencing jurors found as a mitigating factor that Skipper was mentally retarded,[4] but one or more of the sentencing jurors did find that Skipper had consumed alcohol, that he was an alcohol abuser who was under the influence of a mental or emotional disturbance, and that his ability to "appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." (J.A. at 349.) The jury recommended a sentence of death for each of the murders.

On July 29, 1995, the Supreme Court of North Carolina affirmed the convictions and death sentences. *See State v. Skipper*, 446 S.E.2d 252 (N.C. 1994). On January 23, 1995, the United States Supreme Court denied certiorari. On April 17, 1995, the Superior Court of Bladen County appointed post-conviction counsel for Skipper, and Skipper filed a motion for appropriate relief. On January 24, 1996, the Supreme Court of North Carolina denied his motion. On April 15, 1996, Skipper filed a petition for habeas corpus in federal district court. The State moved for summary judgment, and, on December 4, 1996, the district court granted the State's motion for summary judgment and denied Skipper's motion on the ground that all of his federal claims were procedurally barred. We reversed and remanded, concluding that neither the claims that Skipper raised on direct review nor the claims that he raised in his motion for appropriate relief were procedurally defaulted so as to foreclose federal collateral review. *See Skipper v. French*, 130 F.3d 603, 611-13 (4th Cir. 1997). On remand, the district court denied Skipper's discovery requests and also denied

---

[4]The sentencing jury answered "no" to the question of whether "[o]ne or more of us finds" that "[t]he defendant's I.Q. is in the mental retardation range." (J.A. at 349.)

Skipper's request for an evidentiary hearing. On November 30, 1999, the district court again granted the State's motion for summary judgment. On March 30, 2000, the district court denied Skipper's motion for relief from judgment; on May 1, 2000, Skipper filed his notice of appeal. On May 8, 2000, the district court granted a certificate of appealability as to seven of Skipper's claims,[5] stating that "[w]hile the court does not agree that reasonable jurists would find the court's decision wrong, the court concedes that reasonable jurists could find the court's decision debatable." (J.A. at 221.)

Skipper combines four of his claims into the three arguments he makes on appeal. First, Skipper argues that the trial court erred in failing to instruct the jury on second-degree murder. Second, Skipper argues that the district court erred in refusing to grant an evidentiary hearing to determine whether Skipper's trial counsel rendered ineffective assistance in failing to present evidence of Skipper's mental retardation, organic brain damage, and intoxication at the guilt phase of trial. Finally, Skipper argues that his death sentence violates the Eighth and Fourteenth Amendments' prohibition against cruel and unusual punishment because he is mentally retarded. We address each of these arguments, in turn.

## II.

Skipper first argues that he was entitled to an instruction on the lesser-included offense of second-degree murder based upon evidence that he had a cordial relationship with the victims, Pittman and Fipps; that he was confused and remorseful after the murders; and that he was intoxicated at the time of the murders. Skipper asserts that this

---

[5]The district court granted a certificate of appealability as to claims I (entitlement to a second-degree murder instruction), III (ineffective assistance of counsel based upon failure to present evidence of mental retardation and organic brain damage), IV (ineffective assistance based upon failure to present evidence of intoxication), V (cruel and unusual punishment), VI (right to question prospective jurors about their views on the meaning of a life sentence and the possibility of parole), VII (inaccurate information about parole eligibility), and VIII (the jury considered extraneous information not admitted into evidence). Skipper does not raise claims VI, VII, and VIII in this appeal.

evidence, taken along with evidence of his mental retardation and diminished capacity, was sufficient to show that he did not premeditate and deliberate before committing the murders. Applying the standard of review for pre-AEDPA cases, we review questions of law and mixed questions of law and fact de novo.[6] *See Noland v. French*, 134 F.3d 208, 213 (4th Cir. 1998). "Any factual findings by the State court are presumed to be correct as long as they were made after a full, fair, and adequate hearing on the merits." *Id.*; *see* 28 U.S.C.A. § 2254(d) (West 1994) (pre-AEDPA).

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that a defendant is entitled to a lesser included offense instruction when the evidence supports such an instruction. *See id.* at 643. "But due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original). Thus, "'the Circuit and the Supreme Court agree that lesser included offense instructions are not required where . . . there is no support for such instructions in the evidence.'" *Kornahrens v. Evatt*, 66 F.3d 1350, 1354 (4th Cir. 1995) (quoting *Briley v. Bass*, 742 F.2d 155, 165 (4th Cir. 1984)). "The federal rule is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Briley*, 742 F.2d at 165 (internal quotation marks and citations omitted). In other words, "[a] defendant is not entitled to a lesser-included offense instruction as a matter of course." *United States v. Wright*, 131 F.3d 1111, 1112 (4th Cir. 1997). Rather, "[i]n order to receive a lesser-included offense instruction, 'the proof of the element that differentiates the two offenses must be sufficiently in dispute that the jury could rationally find the defendant guilty of the lesser offense but not guilty of the greater offense,'" either because the testimony on the relevant element is sharply conflicting, or because "the conclusion as to the lesser offense [is] fairly inferable from the evidence presented." *Id.* (quoting *United States v. Walker*, 75 F.3d 178-79 (4th Cir. 1996)). The North Carolina rule, similar to the

---

[6]We must "use the pre-AEDPA standard of review in a capital case pending in federal court at the time the AEDPA was signed into law." *Noland v. French*, 134 F.3d 208, 213 (4th Cir. 1998). The parties do not dispute that the pre-AEDPA standard of review applies to this case.

federal rule, is that "[a] defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support that lesser-included offense. When the State's evidence establishes each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude second-degree murder from the jury's consideration." *State v. Thibodeaux*, 532 S.E.2d 797, 806 (N.C. 2000) (internal quotation marks and citation omitted). When resolving a *Beck* claim, the court must focus on whether the evidence warrants the lesser-included offense, and not on whether "the evidence was sufficient to prove the greater one." *Hooks v. Ward*, 184 F.3d 1206, 1232 (10th Cir. 1999).

As stated previously, Skipper argues that he was entitled to an instruction on second-degree murder because the evidence showed that he was intoxicated, that he was remorseful, and that he had a cordial relationship with the victims. In essence, Skipper contends that this evidence was sufficient for a rational jury to acquit him of first-degree murder and convict him of second-degree murder because the jury could have concluded that he did not premeditate and deliberate before killing Pittman and Fipps. We disagree.

Under North Carolina law, first degree murder is "the unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Bonney*, 405 S.E.2d 145, 154 (N.C. 1991). "Second degree murder is defined as the unlawful killing of a human being with malice but without premeditation and deliberation." *Thibodeaux*, 532 S.E.2d at 806 (internal quotation marks omitted). Premeditation "means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." *Bonney*, 405 S.E.2d at 154. Deliberation "means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* The term "cool state of blood," however, "does not mean an absence of passion or emotion. One may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted, and, to a large extent, controlled by passion at the time." *Id.* (internal citations omitted). "An unlawful killing is deliberate and premeditated if done as part of a fixed design to kill, notwithstanding the fact that the defen-

dant was angry or emotional at the time, unless such anger or emotion was strong enough to disturb the defendant's ability to reason." *State v. Fisher*, 350 S.E.2d 334, 338 (N.C. 1986).

We first address Skipper's alleged intoxication at the time of the murders. Courts in North Carolina have applied a standard that requires more than mere intoxication to entitle a defendant to an instruction on second-degree murder based upon voluntary intoxication:

> A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet the defendant's burden of production. *He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.*

*Id.* (internal quotation marks omitted and emphasis added). In other words,

> [t]he evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. In the absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon.

*State v. Strickland*, 361 S.E.2d 882, 888 (N.C. 1987) (quoting *State v. Medley*, 243 S.E.2d 374, 377 (N.C. 1978) (internal citations omitted)).

In the present case, Skipper argues that the guilt-phase jury could have concluded that he lacked the requisite premeditation and deliberation because he "drank a large quantity of beer in the hours prior to the offense," and "asked [Smith] to drive because he was afraid to

drive after drinking so much." (Appellant's Br. at 15-16.) We agree
with the district court that this evidence is not sufficient to meet the
standard of intoxication necessary to entitle the defendant to a second-
degree murder instruction. As the Supreme Court of North Carolina
noted in rejecting this same argument on direct appeal, "[t]here was
no evidence as to how much [Skipper] had had to drink that day, nor
over what period of time. The evidence did establish that the defen-
dant was not visibly intoxicated." *Skipper*, 446 S.E.2d at 266. Indeed,
although Smith testified that he could smell alcohol on Skipper's
breath and that it was apparent that Skipper had been drinking "some
beer," he also conceded that he did not know how much Skipper had
ingested that day or for how long he had been drinking. (J.A. at 275-
76.) Skipper's bare assertion of intoxication and Smith's vague testi-
mony as to Skipper's alcohol intake shows, at best, that Skipper was
merely intoxicated. *See Thibodeaux*, 532 S.E.2d at 807. Mere intoxi-
cation is simply "not enough to meet the defendant's burden . . . [of]
produc[ing] substantial evidence which would support a conclusion
by the judge that he was so intoxicated that he could not form a delib-
erate and premeditated intent to kill." *Id.* (quoting *State v. Williams*,
471 S.E.2d 379, 390 (N.C. 1996)). To the contrary, the only evidence
presented shows that Skipper was sufficiently aware to ask Smith to
drive him in Skipper's truck to Pittman's house; to direct Smith there
because Smith did not know how to get to Pittman's house; to cooly
engage in a fifteen to twenty minute conversation with Pittman; to
grab the semiautomatic weapon, loaded with fragmentation bullets,
from under the passenger seat of his truck and shoot Pittman multiple
times, including as she crouched in a doorway attempting to avoid the
gunfire; to stop shooting and turn his weapon on Fipps, yell "you,
too," and then shoot Fipps several times as well; to ask Smith as they
drove away to confirm that he "g[o]t them"; to direct Smith immedi-
ately to a wooded area where Skipper discarded the weapons and
ammunition; and to warn Smith that he would get twenty years if he
turned himself in. *Cf. Williams*, 471 S.E.2d at 390 (rejecting the argu-
ment that Williams was incapable of forming the requisite intent
because the evidence showed, among other things, that he was able
"to give detailed directions to the witness who drove defendant and
Sikes to [the victim's] home" and "conceal or dispose of incriminat-
ing evidence"). Based upon these facts, we simply cannot agree that
the vague evidence of Skipper's drinking was sufficient to show that
"at the time of the killing defendant's mind and reason were so com-

pletely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill."[7] *Id.* (internal quotation marks omitted). The circumstances that North Carolina courts consider in evaluating the existence of premeditation and deliberation also support our conclusion. These circumstances include: (1) provocation by the deceased; (2) "conduct and statements of the defendant before and after the killing"; (3) "threats and declarations of the defendant before and during the course of the occurrence giving rise to" the killing; (4) ill-will or previous difficulty between the parties; (5) "the dealing of lethal blows after the deceased had been felled and rendered helpless"; and (6) "evidence that the killing was done in a brutal manner." *State v. Fisher*, 350 S.E.2d 334, 338 (N.C. 1986). The nature and number of the victim's wounds also is a fact to be considered, *see State v. Hamlet*, 321 S.E.2d 837, 843 (N.C. 1984), as is the defendant's lack of remorse, *see State v. Geddie*, 478 S.E.2d 146, 163 (N.C. 1996). In the present case, it is undisputed that the victims did nothing to provoke Skipper, that Skipper yelled "you, too" before killing Fipps and that Skipper asked Smith to confirm that he "g[o]t them" after killing Pittman and Fipps. The forensic pathologist who examined the bodies of the victims testified that Pittman had twenty-three wounds in the upper back, eight wounds under her right arm, four wounds on the back of the right hip, two superficial wounds on the back of her left hip, and a wound on her left ankle. The forensic pathologist testified that Fipps had bullet wounds on the right side of his chest and through his right leg. Pittman and Fipps had metal fragments throughout their bodies as a result of the bullets that Skipper used.

We reject Skipper's argument that the jury could have concluded that he did not premeditate and deliberate based upon evidence that he expressed remorse in the days that followed the murders and that he had a cordial relationship with the victims. First, Skipper did not demonstrate remorse until several hours after leaving the murder scene, first at a restaurant in Fayetteville and later at an old house on the highway. Notwithstanding these brief expressions of regret, Skip-

---

[7] Skipper's trial counsel recognized as much, as he admitted to the trial court when he requested the voluntary intoxication instruction that "we recognize in view of the case law that we may be on shaky grounds on that issue." (J.A. at 316.)

per purposefully continued to evade capture, even warning Smith of the consequences if he turned himself in, i.e., that Smith would "g[e]t twenty years." (J.A. at 256.) Second, immediately after killing Pittman and Fipps, Skipper confirmed with Smith that he "g[o]t" them, and he proceeded to direct Smith to a wooded area where Skipper disposed of the weapons and ammunition. (J.A. at 242.) Third, although Smith eventually turned himself in, Skipper did not; instead, he was captured a week after the murders, only after Smith told the police where Skipper was hiding. We do not believe that Skipper's limited statements of regret, made hours after the killings and demonstrably inconsistent with his earlier and later behavior, undermine the conclusion that Skipper premeditated and deliberated prior to killing Pittman and Fipps. Likewise, although Skipper maintains that his lack of premeditation and deliberation is reflected by the cordial relationship that he had with Pittman, we agree with the Supreme Court of North Carolina that this contention is unsupported by the record and, indeed, is belied by the fact that Pittman asked Smith not to bring Skipper to her house anymore. *See State v. Skipper*, 446 S.E.2d 252, 266 (N.C. 1994).

In sum, the evidence of Skipper's drinking, combined with his post-murder statements of remorse and allegedly cordial relationship with Pittman, simply are not enough in conjunction with the other undisputed facts to permit a jury to "rationally find the defendant guilty of the lesser offense but not guilty of the greater offense." *Wright*, 131 F.3d at 1112 (quoting *Walker*, 75 F.3d at 180).[8] Accordingly, we conclude that Skipper is not entitled to relief based upon the trial court's failure to instruct the jury on second-degree murder.[9]

---

[8]To the extent that Skipper asserts that the trial court should have instructed the jury on second-degree murder based upon Skipper's mental retardation and diminished capacity, we disagree. Among other things, we agree with the Supreme Court of North Carolina that "the evidence that defendant was mildly retarded and suffered from organic brain disorder was not presented to the jury until the sentencing phase, so it was not a factor that could support a second-degree murder instruction." *State v. Skipper*, 446 S.E.2d 252, 266 (N.C. 1994).

[9]The State also argues that Skipper's claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989), because his claim would require us to impose a new rule of constitutional law, i.e., that a defendant "is entitled to an

## III.

Skipper next argues that he is entitled to an evidentiary hearing on his ineffective assistance of counsel claim. In particular, Skipper argues that he successfully raised a genuine issue of material fact regarding whether his trial counsel should have offered evidence to the jury during the guilt phase of trial that Skipper was mildly mentally retarded, had organic brain damage that heightened his sensitivity to alcohol, and had a history of severe alcoholism. Skipper argues that had trial counsel presented this evidence to the jury during the guilt phase of trial, the jury could have concluded that he was incapable of premeditation and deliberation. The State responds that Skipper was not entitled to an evidentiary hearing because trial counsel made a reasonable strategic choice to attack the State's proof of Skipper's guilt and to avoid alternative inconsistent theories and that Skipper's claim is meritless as a matter of law because this evidence would not have affected the trial's outcome.

Under pre-AEDPA standards, "[w]here material facts are in dispute, the federal court in a habeas proceeding must hold an evidentiary hearing unless the facts were resolved in a prior state hearing." *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990). "A federal habeas corpus petitioner is entitled to an evidentiary hearing in the district court if (1) he alleges additional facts that, if true, would entitle him to relief; and (2) he is able to establish" that (a) the merits of a factual dispute were not previously resolved in a state hearing; (b) the record as a whole does not fairly support the state factual determination; (c) the state court's fact-finding procedure was not adequate to afford a full and fair hearing; (c) "there is a substantial allegation of newly discovered evidence"; (d) "material facts were not adequately developed at the state court hearing"; or (e) "for any reason

---

instruction on a lesser included offense, simply because a juror may not believe the solid evidence that supports one of the elements of the charged offense, first degree murder, and where the evidence does not support second degree murder." (Appellee's Br. at 9.) The State's *Teague* argument fails, however, because Skipper does not seek a new rule; rather, Skipper argues that the evidence in fact supports a second-degree murder instruction.

it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing." *Poyner v. Murray*, 964 F.2d 1404, 1414 (4th Cir. 1992) (internal quotation omitted).[10]

In order to determine whether Skipper is entitled to an evidentiary hearing on his ineffective assistance of counsel claim, therefore, we examine whether he has alleged additional facts that, if true, would allow him to prevail under the two-pronged inquiry set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that counsel's performance fell below an objective standard of reasonableness. *See id.* at 688. We review counsel's performance under a highly deferential standard, affording a strong presumption that counsel's performance was within the wide range of professionally competent assistance. *See id.* at 689. Second, he must show that there is a reasonable probability that, but for counsel's errors, the results of the proceedings would have been different. *See Williams (Terry) v. Taylor*, 120 S. Ct. 1495, 1511-12 (2000). The level of certainty is something less than a preponderance; it need not be proved that counsel's performance more likely than not affected the outcome. *See Strickland*, 466 U.S. at 693. Rather, the petitioner need only show a probability sufficient to undermine confidence in the outcome. *See id.* at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697.

To attack the reasonableness of trial counsel's actions, Skipper first points to the evaluation of Dr. Puente, who examined Skipper at the request of trial counsel. Dr. Puente opined that Skipper was mildly mentally retarded, with an I.Q. of 69, and that he suffered from organic brain damage. Later, in a post-trial affidavit that was submitted four years after Dr. Puente's original evaluation and three years after trial, Dr. Puente stated that "as a direct result of [Skipper's]

---

[10]The pre-AEDPA version of § 2254(d) provides two additional factors: (f) "that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding"; or (g) "the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding." *Beaver v. Thompson*, 93 F.3d 1186, 1190 n.4 (4th Cir. 1996).

retardation and organic brain injury . . . he is not able to plan, deliberate and premeditate." (J.A. at 77.) Dr. Puente also stated in his post-trial affidavit that he was asked by counsel to testify at sentencing to render an opinion as to Skipper's ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law, but that he was not asked to testify at the guilt phase of the trial or "to render any opinion about [Skipper's] ability to premeditate and deliberate." (J.A. at 78.) Skipper maintains that trial counsel's decision to present Dr. Puente's opinion at sentencing, but not at the guilt phase of trial, was unreasonable.

Skipper also argues that trial counsel failed to investigate Skipper's history of alcoholism and his heightened sensitivity to alcohol, which reportedly was the result of organic brain damage. Skipper points to the testimony of Dr. Roy Mathew, a psychiatrist who was appointed to assist Skipper in federal habeas proceedings. Dr. Mathew has opined that Skipper was unable to form the specific intent to kill or to premeditate and deliberate as a result of his history of alcoholism and use of alcohol on the day of the killings.

Finally, Skipper points to lay testimony that Skipper drank a six-pack of beer on the day of the killings, as well as lay testimony concerning Skipper's inability to hold steady jobs, do his own grocery shopping, or be financially independent. For this lay testimony, Skipper relies largely upon the affidavit of a Duke University law student who assisted post-conviction counsel by interviewing Skipper eight times, his family, and other lay witnesses. The law student's affidavit states, among other things, that although Skipper owned his own junkyard business, his business was not profitable, in part because he failed to keep records and run the business in a manner of a true commercial enterprise. The law student's affidavit also states that Skipper is not financially independent, that he never learned how to write a check, that he has no credit, and that he relies upon others for his basic needs. Finally, the affidavit states that she interviewed an unnamed witness who saw Skipper drink a six-pack of beer on the morning of the killings and that another unnamed witness told her that Skipper became "a completely different person" after drinking only a small amount of alcohol.[11] (J.A. at 91.)

---

[11]The district court refused to consider the law student's affidavit because it concluded that the affidavit "is replete with inadmissible hear-

As noted above, trial counsel obtained Dr. Puente's opinion that Skipper was mildly mentally retarded and had organic brain damage. Trial counsel chose not to present this evidence during the guilt phase of trial and, instead, sought to undermine the State's evidence that Skipper was the killer by suggesting that another person killed Pittman and Fipps and pointing to the presence of an unidentified third person as well as Smith, and by implying that Smith was attempting to conceal his own guilt. Trial counsel impeached Smith's credibility by demonstrating that Smith had previously been convicted of other crimes, including four counts of common law forgery, and by suggesting that Smith fabricated his testimony in order to avoid being charged with two counts of first degree murder himself.[12] Trial counsel also attacked the police investigation, including the police's failure to seek fingerprints, soil samples, or clothing fiber on the truck or the weapon. We agree with the district court that trial counsel's conscious decision to focus on Skipper's actual innocence and to avoid inconsistent defense theories was not objectively unreasonable. *See Jackson v. Shanks*, 143 F.3d 1313, 1320 (10th Cir.) (concluding that trial counsel was not objectively unreasonable in failing to seek diminished capacity and intoxication instructions based in part upon borderline mental retardation because "trial counsel's defense was that Mr. Jackson was not present and did not participate in the robbery. Pursuing a diminished capacity defense would have been inconsistent with Mr. Jackson's complete denial of involvement in the robbery."), *cert. denied*, 525 U.S. 950 (1998).

Skipper concedes that trial counsel focused a large part of Skipper's defense on Skipper's identity as the killer but makes much of the fact that trial counsel sought jury instructions on second-degree murder and voluntary intoxication. Skipper maintains that trial coun-

---

say." (J.A. at 180.) Skipper contends that the district court erred in doing so because the affidavit was introduced into the state court record and the state court considered the affidavit. Even if we considered the law student's affidavit, however, it would not alter our conclusion that trial counsel was not constitutionally ineffective.

[12]Smith was initially charged with two counts of first-degree murder. Prior to trial, those charges were dismissed. Smith pleaded guilty to two counts of accessory after the fact.

sel could not have intended to avoid inconsistent defenses and still have requested these lesser-included offense instructions. We disagree. "Although inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988) (en banc) (internal quotation marks omitted), *overruled on other grounds*, *Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997). To the extent that trial counsel referred to Skipper's inability to premeditate and deliberate, he did so in the context of attacking Smith's credibility as a witness:

> What - what has Mark Smith proven? Because he is the accuser. Let's look at Mark Smith. . . . Let's talk about the first time Mark saw Sherman Skipper. Was Sherman Skipper on that day a man with a fixed design, a man who had shown deliberated — deliberation and premeditation, a man who expressed an intent to kill someone?

> Ladies and gentleman, this man went to Mark Smith's house. Now, if a man was planning to kill somebody, why would he go get a witness? Why would he go pick up a witness to the killing? But what did Mark do? [Skipper] went there; he did not to want to drive because he'd had too much beer to drink. But Mark said he was calm, appeared to be nothing wrong with him, appeared to be acting normally.

(J.A. at 321-22.) In other words, although the jury heard evidence and argument of Skipper's intoxication and diminished capacity, trial counsel presented that evidence and argument as part of his strategy of attacking Smith's credibility and maintaining Skipper's actual innocence. We believe, on these facts, that it was not unreasonable, albeit not with a high expectation of success, for trial counsel to seek second-degree murder and voluntary intoxication instructions based upon the evidence already before the jury as part of Skipper's defense of actual innocence, and also to forego presenting additional evidence of diminished capacity that would have unduly emphasized the inherent inconsistency of pursuing both defenses.[13] *See Harich*, 844 F.2d

---

[13]We note that according to Dr. Puente's report, Skipper continued to deny killing Pittman and Fipps during Dr. Puente's evaluation, stating

at 1470 ("By handling the matter the way he did, defense counsel was able to inject the thought of diminished capacity (due to heavy drinking and marijuana) without totally rejecting the testimony of Harich [denying any involvement in the murders]." (internal quotation marks omitted)).

Indeed, we find it notable that, before trial, trial counsel obviously recognized the importance of Skipper's mental state; trial counsel was the one who initially requested Dr. Puente's testimony. Consequently, this is not a situation in which trial counsel neglected to investigate Skipper's alleged mental retardation or developed his defense without adequate information.[14] *See Strickland*, 466 U.S. at 690-91 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Washington v. Murray*, 4 F.3d 1285, 1288 (4th Cir. 1993) ("*Strickland* makes plain that a lawyer's

---

that "[h]e was very concerned that people would implicate him in all of this as he had hit [Pittman] recently, and he decided to stay away. He went into hiding because he thought he would be charged." (J.A. at 82.)

[14]Although Skipper argues that trial counsel should have presented Dr. Puente's opinion that Skipper was incapable of premeditation and deliberation, we note that the Supreme Court of North Carolina had previously held as inadmissible expert medical opinions concerning a defendant's inability to premeditate and deliberate. *See State v. Rose*, 373 S.E.2d 426, 429 (N.C. 1988) (stating that expert testimony [that the defendant was incapable of premeditation or deliberation] would have been inadmissible as a conclusion that a legal standard had not been met"); *see also State v. Anderson*, 513 S.E.2d 296, 313 (N.C. 1999) (stating that "testimony by medical experts relating to precise legal terms such as 'premeditation' or 'deliberation,' definitions of which are not readily apparent to such medical experts, should be excluded"); *State v. Daniel*, 429 S.E.2d 724, 728-29 (N.C. 1993) (stating that although expert testimony of organic brain impairment, which affected Daniel's ability to plan and reflect, could assist the jury in determining whether he premeditated and deliberated, "testimony by medical experts relating to precise legal terms such as 'premeditation or deliberation' . . . should be excluded").

performance will not be deemed deficient if it results from informed, strategic choices about how to mount a defense."); *see also Lockett v. Anderson*, No. 98-60019, 2000 WL 1520594, at *16 (5th Cir. Oct. 13, 2000) (stating that *Strickland* "demands more than the mere decision of a strategic choice by counsel. It requires informed strategic choices." (internal quotation marks omitted)); *cf. Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) ("To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy. . . . Because the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits that his performance was deficient matters little.").

We are mindful of the highly deferential standard on which we are to review counsel's decisions, as well as the strong presumption that counsel's performance was within the wide range of professionally competent assistance. *See Strickland*, 466 U.S. at 689. Here, trial counsel recognized that a defense of diminished capacity based upon voluntary intoxication was weak, (*see* J.A. at 316 (trial counsel's concession that "we may be on shaky grounds on that issue")), and he reasonably may have chosen to maintain his credibility with the jury in the face of strong evidence showing that if Skipper was the killer, he acted with premeditation and deliberation. The fact that trial counsel requested lesser-included instructions based upon the evidence that was already before the jury is not inconsistent with the strategic choice to avoid additional evidence of diminished capacity that might easily have highlighted inconsistencies and undermined counsel's credibility before the jury. *Cf. United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999) ("We can conceive of numerous reasonable strategic motives for the decision."). We conclude that Skipper has not "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Moreover, even assuming that trial counsel's decision not to present evidence of Skipper's mental impairment and sensitivity to alcohol at the guilt phase of trial was not a reasonable strategic decision, Skipper has also failed to show a reasonable probability that this evidence, if presented during the guilt phase of trial and taken as true, could have affected the outcome of the case. After reviewing the undisputed facts in the record, we, like the other courts that have

reviewed the record, simply cannot see how a reasonable jury could have acquitted Skipper on the first-degree murder charge and convicted him on a second-degree murder charge, even in light of this additional evidence. As noted above, the evidence of Skipper's premeditation and deliberation is simply overwhelming. *See supra* part II (describing undisputed evidence of Skipper's words and conduct showing premeditation and deliberation).[15] Accordingly, we conclude that Skipper was not entitled to an evidentiary hearing on his ineffective assistance of counsel claim because he has failed to raise a genuine issue of material fact that trial counsel was objectively unreasonable, or that the evidence of his mental condition and intoxication, if presented during the guilt phase of trial, could have affected the outcome of the proceedings.

## IV.

Finally, Skipper argues that it is unconstitutional to impose the death penalty on him because he is mentally retarded. We disagree.

As a threshold matter, the State argues that Skipper is procedurally

---

[15]We also note that although Dr. Puente opined that Skipper had organic brain damage, was mentally retarded, and had "[a] limited ability to plan, to carry out, to understand or reflect about the serious issues in life," (TT, at 1000+635), the sentencing jury nevertheless sentenced Skipper to death on each of the murder counts even after hearing Dr. Puente's testimony, as well as the other evidence of Skipper's mental capacity and sensitivity to alcohol. *See Harich v. Dugger*, 844 F.2d 1464, 1472 (11th Cir. 1988) (finding it unlikely that similar expert testimony would have impacted the jury's determination of guilt because "[d]efense counsel did use an expert during the penalty phase with apparently no impact on the jury's recommended sentence. It is, therefore, not reasonably probable that presenting expert testimony earlier would have resulted in a different verdict."). Although at least one juror found that Skipper had consumed alcohol and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired," (J.A. at 349); N.C. Gen. Stat. § 15A-2000(f)(6), the sentencing jury answered "no" to the question of whether "[o]ne or more" of the jurors found the mitigating circumstance that "[t]he defendant's I.Q. is in the mental retardation range." (J.A. at 349.)

defaulted from raising this argument because he failed contemporaneously to object at trial and also failed formally to assign this issue as error on direct appeal. *See State v. Skipper*, 446 S.E.2d 252, 283 (N.C. 1994). "Absent cause and prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." *Jenkins v. Hutchinson*, 221 F.3d 679, 682 (4th Cir. 2000). "Such a rule is adequate if it is regularly or consistently applied by the state court, and is independent if it does not depend on a federal constitutional ruling." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999) (internal quotation marks, citations, and alterations omitted). "[W]e will not assume that a state-court decision rests on adequate and independent state grounds when the 'state-court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

In the present case, the Supreme Court of North Carolina stated, in addressing Skipper's direct appeal on his Eighth Amendment Claim, that "[t]o begin, we note that defendant did not object to the imposition of the death penalty on these grounds at trial. Nor did defendant make this an assignment of error in the record. *Accordingly, the issue is deemed waived by defendant*."[16] *Skipper*, 446 S.E.2d at 283 (emphasis added). The court then addressed the merits of the claim and concluded that the imposition of the death penalty upon Skipper was not unconstitutional. *See id.*

---

[16]North Carolina Rule of Appellate Procedure 10(b)(1) provides that "[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. . . . Any such question which was properly preserved for review by action of counsel taken during the course of proceedings in the trial tribunal by objection noted or which by rule or law was deemed preserved or taken without any such action, may be made the basis of an assignment of error in the record on appeal." N.C. R. App. P. 10(b)(1).

We assume without deciding that the state procedural rule relied upon in this case — that the court will not consider the merits of claims for which there was no objection at trial or assignments of error on appeal — is inadequate because it has not been consistently applied by North Carolina courts in capital cases. We note that the Supreme Court of North Carolina has stated that "'in all capital cases reaching this Court, it is the settled policy to examine the record for the ascertainment of reversible error. If, upon such an examination, error is found, it then becomes the duty of the Court upon its own motion to recognize and act upon the error so found.'" *State v. Gregory*, 467 S.E.2d 28, 32 (N.C. 1996) (quoting *State v. McCoy*, 71 S.E.2d 921, 922 (N.C. 1952)); *State v. Mosely*, 449 S.E.2d 412, 433-34 (N.C. 1994) ("Since defendant did not object or allege plain error, he has failed to properly preserve this issue for appeal. However, since this is a case in which the death penalty was imposed, we will consider the merits of the issue under a plain error analysis."); *State v. Payne*, 402 S.E.2d 582, 592 (1991) ("By failing to object or move for a mistrial in regard to the unsworn deputy, defendant has waived his right to have this issue considered on appeal. Nonetheless, since this is a capital case, we will address the issue." (internal citations omitted)); *cf. Smith v. Dixon*, 14 F.3d 956, 972 & n.10 (4th Cir. 1994) (en banc) (affirmed by equally divided court) (recognizing that "the Supreme Court of North Carolina has previously examined the entire record of the capital case for error on direct review, including error that was not properly preserved," and referring to the Supreme Court of North Carolina's "well-established rule, that in its direct review of capital cases it will consider all errors").[17]

---

[17]The State argues that "North Carolina's procedural bar has been found to be an adequate and independent state law basis precluding federal review." (Appellee's Br. at 46.) We note, however, that the State supports this argument by relying upon cases involving N.C. Gen. Stat. § 15A-1419(a)(3), which addresses default of claims on state collateral review that are not raised on direct appeal. *See Williams v. French*, 146 F.3d 203, 209 (4th Cir. 1998). The State does not cite to any cases addressing default of claims on direct review that are not raised at the trial court. *Cf. Smith v. Dixon*, 14 F.3d 956, 972 (4th Cir. 1994) (en banc) (affirmed by equally divided court) (noting the difference between the two situations and rejecting Smith's argument that the Supreme Court of North Carolina's practice of reviewing all errors on direct review, even if not raised at the trial court, demonstrated that the state procedural bar against claims on collateral review that were not raised on direct appeal was not consistently applied).

Nevertheless, Skipper cannot prevail on the merits of his Eighth Amendment claim. The Supreme Court has previously held that the Eighth Amendment does not categorically prohibit the death penalty for mentally retarded persons. *See Penry v. Lynaugh*, 492 U.S. 302, 340 (1989). In *Penry*, the Supreme Court recognized that the prohibition against cruel and unusual punishment is marked by the evolving standards of decency in our society and that "[t]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id.* at 331. The Court also noted that "[w]hile a national consensus against execution of the mentally retarded may someday emerge reflecting the evolving standards of decency that mark the progress of a maturing society, there is insufficient evidence of such a consensus today." *Id.* at 340 (internal quotation marks omitted).

Skipper argues that the national consensus has changed since *Penry*, as demonstrated by the fact that eleven additional states have outlawed the death penalty for mentally retarded persons since *Penry*. Even if we accepted Skipper's argument, however, Skipper would not be entitled to prevail for the simple reason that he has not shown that he is in fact mentally retarded. Indeed, none of the jurors in this case found as a mitigating circumstance that Skipper was mentally retarded, even after hearing Dr. Puente's testimony that Skipper had an I.Q. of 69, which placed him in the mildly mentally retarded range. Notably, Dr. Puente's report and testimony also revealed that Skipper had been married for five years, worked in several jobs, and, for seven years, owned and operated a 200-300 car junkyard that he sold for approximately $25,000. *Cf. State v. Best*, 467 S.E.2d 45, 53-54 (N.C. 1996) (rejecting Best's Eighth Amendment argument because of *Penry*, and because "it is not at all certain that he is mentally retarded" despite his I.Q. of 70 because "he was employed and was able to function in society"); *Jones v. Johnson*, 171 F.3d 270, 276 (5th Cir.) ("Even Dr. Landrum's low figures, however, fall within the borderline area between mild retardation (below 70) and dull normal intelligence. We have found that a showing of borderline or below average intelligence does not constitute a showing of mental retardation."), *cert. denied*, 527 U.S. 1059 (1999); Ark. Code Ann. § 5-4-618(a)(2) (West 2000) (defining mental retardation and providing a "rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below"); Colo. Rev. Stat.

Ann. § 16-9-402(2) (West 2000) ("The defendant shall have the burden of proof to show by clear and convincing evidence that such defendant is mentally retarded."). Because it is questionable, at best, whether Skipper is mentally retarded, and, indeed, because the sentencing jury has explicitly found to the contrary, we reject Skipper's argument.[18]

V.

In conclusion, we hold that Skipper was not entitled to a second-degree murder instruction, that Skipper was not entitled to an evidentiary hearing on his ineffective assistance of counsel claim, and that Skipper's trial counsel was not constitutionally ineffective. We also hold that even if Skipper is not procedurally barred from arguing that his death sentence constitutes cruel and unusual punishment, he cannot prevail on the merits of his claim because he has failed to show that he is mentally retarded. We, therefore, affirm the district court's denial of Skipper's petition for habeas corpus relief.

*AFFIRMED*

---

[18]The State also argues that *Teague* bars Skipper from raising this argument because he is asking us to impose a new rule on collateral review that it is unconstitutional to execute a mentally retarded person. The Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), addressed this same issue and stated that "if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity [which covers rules that prohibit a certain category of punishment for a class of defendants because of their status] and would be applicable to defendants on collateral review." *Id.*